# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SHARON ROLLINS, | |
| Plaintiff, | |
| v. | Civil Action No. 10-00047 (BAH) |
| WACKENHUT SERVICES, *et al*., | |
| Defendants. | |

## <u>MEMORANDUM OPINION</u>

On December 10, 2008, twenty-three-year-old Devin Darell Bailey was working as an armed security guard for Wackenhut Services, Inc. when he committed suicide with his work-issued gun.  Mr. Bailey had a history of mental illness and, when he died, he was taking an antipsychotic drug used to treat bipolar disorder and another drug that prevents disordered thoughts.  Bailey's mother, the plaintiff Sharon Rollins, brings this suit, both on her own behalf and as the executrix of Bailey's estate, for wrongful death and survival actions against three defendants: Wackenhut Services, Inc. ("Wackenhut"); Otsuka Pharmaceutical Company ("Otsuka America"), a Delaware business corporation that manufactured the antipsychotic medication; and Bristol-Myers Squibb Company ("Bristol-Myers"), a pharmaceutical company that allegedly was a collaborative partner with Otsuka America in the development and commercialization of the antipsychotic drug.  The plaintiff is also suing Defendant Wackenhut for punitive damages.  Defendant Wackenhut has moved to dismiss the plaintiff's claims and Defendants Otsuka America

and Bristol-Myers have moved for judgment on the pleadings.  For the reasons explained below, the defendants' motions are granted.[1]

## I.   BACKGROUND

Mr. Bailey's struggle with his mental health became apparent in college, when he needed to leave after his second year of school because he was suffering from severe depression and other mental health problems.  Compl. ¶ 11.  On July 13, 2006, after Mr. Bailey left college, he joined the Navy, but his mental health problems continued.  *Id.* ¶ 12.  A few days after enlisting, on July 17, 2006, Mr. Bailey was psychiatrically hospitalized at the North Chicago V.A. Hospital, where he was diagnosed with mental disorders, including psychosis.  *Id.*  Based on these mental disorders, the Navy formally discharged Mr. Bailey.  *Id*. ¶¶ 12, 34.

About a year after his discharge from the Navy, on April 16, 2007, the Washington, D.C. Metropolitan Police were called to Plaintiff Rollins's house, after receiving radio reports about a family disturbance that involved Mr. Bailey.  *Id.* ¶ 13.  The police officers tried to talk to Mr. Bailey, but he resisted and, after he kicked one of the police officers in the leg, a search revealed that Mr. Bailey had an eight-inch knife in his jacket.  *Id.* ¶¶ 13-14.

The police officers charged Mr. Bailey with three criminal offenses: two counts of assault on a police officer and one count of carrying a dangerous weapon.  *Id.* ¶ 15.  When Mr. Bailey appeared in the District of Columbia Superior Court to face these

---

[1] Federal jurisdiction in this case is premised upon 28 U.S.C. § 1332. The plaintiff filed this case in the Superior Court for the District of Columbia and the defendants sought removal to this Court because the action is between citizens of different states and the amount in controversy exceeds $75,000. *See* Notice of Removal ¶ 6. In addition, venue is proper in this District pursuant to 28 U.S.C. §1441, which provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." *Id.*

charges, the Court ordered a competency screening to determine if he was fit to stand trial.  *Id.*  On June 26, 2007, the assigned physician reported that Mr. Bailey refused to leave his Mental Health Treatment Unit Cell Block to attend the competency screening.  *Id.*  Shortly thereafter, the Court ordered that Mr. Bailey be formally admitted to St. Elizabeth's Hospital.  *Id.*

St. Elizabeth's Hospital performed a full mental history examination, and diagnosed Mr. Bailey with "Bipolar Disorder, Most Recent Episode Mixed, Severe with Psychotic Features."  *Id.* ¶ 17.  The hospital prescribed two medications for Mr. Bailey's condition, Rispardal and Depakene, and discharged him three weeks after he was admitted.  *Id.*

After being discharged, Mr. Bailey actively pursued employment but continued to struggle with his mental health.  *Id.* ¶¶ 19-21.  On May 14, 2008, he voluntarily admitted himself as an in-patient for help and treatment at Washington Adventist Hospital in Takoma Park, Maryland.  *Id.* ¶ 21.  According to the Complaint, at Washington Adventist Hospital, Mr. Bailey was prescribed Abilify, an antipsychotic drug used to treat bipolar disorder and schizophrenia, for the first time.  *Id.*  The U.S. Food & Drug Administration requires Abilify to be labeled with several warnings, one of which states: "Children, adolescents, and young adults taking antidepressants for major depressive disorder (MDD) and other psychiatric disorders are at increased risk of suicidal thinking and behavior."  *Id.* ¶ 23.

Mr. Bailey was initially prescribed 15 mg of Abilify per day, a dosage that was later increased to 20 mg per day before he was discharged from Washington Adventist Hospital on May 20, 2008.  *Id.* ¶ 24.  Upon his discharge, Mr. Bailey was directed to

continue taking Abilify as well as Fluphenazine (Prolixin), which helps prevent disordered thoughts. *Id.* About a month later, on July 7, 2008, and again on August 25, 2008, Mr. Bailey was given additional prescriptions for Abilify and directed to take two 15 mg tablets per day, which the Complaint contends is the maximum legal dosage. *Id.* ¶ 25.

On September 3, 2008, Mr. Bailey applied for employment as a security guard with Defendant Wackenhut. *Id.* ¶ 26. As part of the application process, Mr. Bailey took a test for illegal drug use and had a physical medical examination. *Id.* On October 27, 2008, Wackenhut offered him a position as an armed security guard. Since Wackenhut contracted with the U.S. Army, the employment offer was made contingent upon successful completion of training and certification by the U.S. government, which included certain "weapons qualifications" and a "criminal justice screening." *Id.* ¶ 27.

On November 4, 2008, Wackenhut's National Research Center prepared a Background Screening Report on Mr. Bailey that indicated a warrant had been issued for his failure to appear in court to answer two undisposed charges for "assault on a police officer" and "carry[ing a] dangerous weapon." *Id.* ¶¶ 28, 29. According to the Complaint, Wackenhut did not follow up on the information in the Background Screening Report. *Id.* ¶ 30.

On November 5, 2008, after successfully completing the weapons qualifications, Wackenhut issued Mr. Bailey a firearm. *Id.* ¶¶ 31, 32. Mr. Bailey officially became an armed security guard for Wackenhut, on November 15, 2008, when he completed the Security Officer Course. *Id.* ¶ 35. Less than a month later, on December 9, 2008, while he was on duty as a contract security officer for Wackenhut, Mr. Bailey killed himself

with his work-issued gun.  *Id.* ¶ 36.   An autopsy by the Office of the Armed Forces

Medical Examiner confirmed that the death was a suicide and noted that Mr. Bailey "had

a mental health history and had been prescribed Fluphenazine and Abilify."  *Id.* ¶ 37.

The plaintiff initially brought this action in the Superior Court of the District of

Columbia.  On January 11, 2010, the defendants removed the case to this Court based on

diversity of citizenship.  Notice of Removal, ECF No. 1.  In Count I of the Complaint,

plaintiff Rollins brings a wrongful death claim against all three defendants.  Compl. ¶¶

38-44.  The plaintiff claims Defendant Wackenhut was negligent because it (1) failed to

properly investigate the status of the charges listed on Mr. Bailey's Background

Screening Report and the information regarding his mental health noted in his military

discharge papers; (2) illegally and improperly issued Mr. Bailey a firearm when it knew

or should have known he was legally prohibited from possessing the weapon; and (3)

allowed Mr. Bailey to continue possessing the firearm for over a month when his legal

disabilities against firearm possession were or should have been apparent.[2]  *Id.* ¶¶ 34,

40(a), (b), (c). The plaintiff also brings a wrongful death claim against defendants Otsuka

America and Bristol-Myers for "manufacturing and distributing Abilify within the United

States, despite its known risks of increasing suicidality in certain patients."  *Id.* ¶ 43.

In Count II, the plaintiff brings a survival action, on behalf of her son, against all

three defendants for the "pain and suffering, mental anguish, inconvenience, and

---

[2] Plaintiff alleges that the issuing of the firearm violated 18 U.S.C. § 922 (g)(2), which states: "It shall be unlawful for any person--who is a fugitive from justice. . .to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  Compl. ¶ 32. Furthermore, the plaintiff alleges that if Wackenhut had exercised ordinary care by examining Mr. Bailey's D.C. Superior Court file, it would have discovered that he had been committed to a mental hospital pursuant to court order, thus making the issuance of the firearm unlawful under another provision of § 922(g).  *Id.* ¶ 33. The plaintiff does not indicate which other provision of § 922(g) is relevant. The provision the plaintiff likely is referencing is § 922(g)(4), which states: "It shall be unlawful for any person--who has been adjudicated as a mental defective or who has been committed to a mental institution. . .to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

discomfort" experienced between her son's injury and time of death as well as for the economic loss of future earnings. *Id.* ¶¶ 46, 47.

In Count III, the plaintiff seeks punitive damages from Defendant Wackenhut for recklessly failing to perform a follow-up to Mr. Bailey's Background Screening Report, training him in firearms, and giving him access to firearms after his alleged legal disqualifications either were or should have been obvious. *Id.* ¶ 49.

The plaintiff seeks judgment of $1,000,000 against all three defendants for wrongful death and an additional $1,000,000 from each defendant under the survival action. The plaintiff also seeks $3,000,000 in punitive damages from Defendant Wackenhut Services. *Id.* ¶ 51.

On January 20, 2010, Defendant Wackenhut filed a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6). ECF No. 15. On the same day, Defendants Bristol-Myers and Otuska America each filed a separate motion for judgment on the pleadings pursuant to Rule 12(c).[3] ECF Nos. 12, 16. These motions are now before the Court.[4]

---

[3] Federal Rule 12(c) enables a party to move for a judgment on the pleadings after the pleadings are closed as long as it is early enough not to delay trial. Defendants Bristol-Myers and Otsuka America filed answers and a notice of removal simultaneously in this case, making the filing by these two defendants of a 12(b)(6) motion inappropriate. *Langley v. Napolitano*, 677 F. Supp. 2d 261, 263 (D.D.C. 2010) (Since defendant has already filed an answer, dismissal motion under Fed. R. Civ. P. 12(b)(6) "is more appropriately construed as a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c)"); *Douglass v. District of Columbia*, 605 F. Supp. 2d 156, 161 (D.D.C. 2009) (treating Rule 12(b) motion to dismiss filed after answer as a motion for judgment on the pleadings under Rule 12(c)). *See also* Def. Bristol-Myers Mem. in Supp. of Mot. to Dismiss ("BMS Mem."), ECF No. 12, at 3 n.6.

[4] This case was re-assigned to the current presiding judge on January 21, 2011.

## II. DISCUSSION

### A. Standards of Review

#### 1.    Motion to Dismiss for Lack of Subject Matter Jurisdiction.

A court must dismiss a case when it lacks subject matter jurisdiction. *McManus v. District of Columbia*, 530 F. Supp. 2d 46, 62 (D.D.C. 2007). "Plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Am. Farm Bureau v. U.S. EPA*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000); *accord Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). It is well established that, in deciding a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a court must construe the allegations in the Complaint liberally but "need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiffs' legal conclusions." *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006); *see also Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), vacated on other grounds, 482 U.S. 64 (1987). The Court must be assured that it is acting within the scope of its jurisdictional authority and therefore must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. *See Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003); *Westberg v. FDIC*, 759 F. Supp. 2d 38, 41 (D.D.C. 2011); *Dubois v. Wash. Mut. Bank*, 2010 U.S. Dist. LEXIS 91855, at *5-6 (D.D.C. Sept. 2, 2010); *Hoffman v. District of Columbia*, 643 F. Supp. 2d 132, 135-136 (D.D.C. 2009); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001). In evaluating subject matter jurisdiction, the Court, when necessary, may look outside the Complaint to "undisputed facts evidenced in the

record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Sci.*, 974 F.2d 192, 197 (D.C. Cir. 1992) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)); *see also Alliance for Democracy v. FEC*, 362 F. Supp. 2d 138, 142 (D.D.C. 2005).

### 2.   Motion to Dismiss for Failure to State a Claim.

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[ ] [his or her] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 12(b)(6).  Although detailed factual allegations are not required, the Complaint must set forth "more than an unadorned, the defendant-unlawfully-harmed-me accusation," *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009), and may not merely state "a formulaic recitation of the elements of a cause of action." *Twombly,* 550 U.S. at 555. Instead, the complaint must plead facts that are more than "merely consistent with" a defendant's liability; "the plaintiff [must plead] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (internal quotation marks omitted) (citing *Twombly,* 550 U.S. at 556).

### 3.   Motion for Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c).

Rule 12(c) allows for judgment on the pleadings after responsive pleadings have been filed but prior to trial.  The standard for a motion for judgment under Rule 12(c) is essentially the same standard as a motion to dismiss under Rule 12(b)(6). *See Schuchart v. La Taberna Del Alabardero, Inc*., 365 F.3d 33, 35 (D.C. Cir. 2004); *Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C. Cir. 1987), abrogated on other grounds by *Hartman v.*

*Moore*, 547 U.S. 250 (2006); *Baumann v. District of Columbia,* 744 F. Supp. 2d 216, 221

(D.D.C. 2010); *Sanders v. District of Columbia*, 601 F. Supp. 2d 97, 99 (D.D.C. 2009)

("The standard of review for motions for judgment on the pleadings under Rule 12(c) of

the Federal Rules is essentially the same as that for motions to dismiss under Rule

12(b)(6)."). "Because a Rule 12(c) motion would summarily extinguish litigation at the

threshold and foreclose the opportunity for discovery and factual presentation, the Court

must treat Defendants' motion with the greatest of care and deny it if there are allegations

in the complaint which, if proved, would provide a basis for recovery." *Baumann*, 744 F.

Supp. 2d at 221 (quotations omitted) (citing *Haynesworth*, 820 F.2d at 1254).

### B. Analysis

### 1. The Court has Subject Matter Jurisdiction over the Plaintiff's Claims Against Defendant Wackenhut.

Defendant Wackenhut claims that the Court lacks subject matter jurisdiction

because the District of Columbia Workers' Compensation Act ("DCWCA") provides the

exclusive remedy for injuries that occur during the course of a worker's employment.

Def. Wackenhut's Mem. in Supp. of Mot. to Dismiss ("Wackenhut Mem.") at 3.  While

the DCWCA is the exclusive remedy "for any illness, injury, or death arising out of and

in the course of employment," D.C. Code § 32-1504(b), there are some limited

circumstances where the DCWCA does not apply.  As relevant here, the DCWCA does

not apply "where injury to the employee was occasioned solely by his intoxication or by

his willful intention to injure or kill himself or another."  D.C. Code  §32-1503(d).  Since

Mr. Bailey's suicide falls under this exception to workers' compensation coverage, his

claim is properly before the Court.  *See* Pl.'s Opp'n to Wackenhut Mem. at 3.

"The [DCWCA] provides a comprehensive scheme for compensating private sector employees for their work-related injuries. It makes the employer liable without fault if the employee's occupational injury or death falls within the scope of the Act, but as a *quid pro quo* for such automatic liability the Act provides the employee's exclusive remedy-an administrative remedy-against the employer for injuries within its reach." *Estate of Underwood v. Nat'l Credit Union Admin.,* 665 A.2d 621, 630 (D.C. 1995) (internal citations omitted).  The issue in this case is whether the plaintiff's claim against Wackenhut is compensable under the DCWCA and thus is not eligible for a lawsuit in court.  *See id.* at 631.

"[W]hen there is a 'substantial question' whether the [DCWCA] applies, the administrative agency charged with implementing the statute, given its special expertise, has 'primary jurisdiction' to 'make the initial determination concerning coverage' before the courts can exercise jurisdiction." *Id*. at 630 (quoting *Harrington v. Moss*, 407 A.2d 658, 661 (D.C. 1979) (internal quotations omitted)).  "A substantial question will exist unless [the] injuries were clearly not compensable under the [statute]." *Grillo v. Nat'l Bank of Washington*, 540 A.2d 743, 749 (D.C. 1988) (quoting *Tredway v. District of Columbia*, 403 A.2d 732, 735 (D.C. 1979) (interpreting the similar Federal Employee's Compensation Act) (internal citations and quotations omitted); *see also Estate of Underwood,* 665 A.2d at 630 ("Unless a claimant's injuries clearly are not compensable under the WCA-*i.e.,* when there is a substantial question whether the WCA applies-the administrative agency charged with administering workers compensation claims, the Department of Employment Services (DOES), not the Superior Court, has primary jurisdiction. . . .") (internal quotations omitted).

The Court finds that there is not a "substantial question" as to whether Mr. Bailey's suicide is covered by the DCWCA.  The exception set forth in D.C. Code § 32-1503(d) applies and Mr. Bailey's suicide is not covered by the Act.

The plaintiff argues that this statute clearly excludes Mr. Bailey's suicide from workers' compensation coverage.  Defendant Wackenhut counters that Bailey's suicide actually does not fall under the "willful intention to injure or kill himself" exception because, according to Wackenhut, the statutory language of D.C. Code § 32-1503(d) only excludes compensation for deaths occasioned "solely" by a willful intention to kill oneself.  Def.'s Reply to Pl.'s Opp'n to Wackenhut Mem. ("Wackenhut Reply") at 2. Since the plaintiff has alleged that Wackenhut's negligence contributed to the suicide, Wackenhut argues that the plaintiff has not alleged that the death was occasioned "solely" by the decedent's suicidal intention as necessary to fall under the exclusion.  *See id*.  The plaintiff responds that Wackenhut's reading of the statute is flawed and that "solely" only modifies the first clause of D.C. Code § 32-1503(d) – i.e., the clause referring to an injury occasioned "solely by . . . intoxication."  *See* Pl's Sur-reply to Wackenhut Mem. ("Pl.'s Sur-reply") at 1-4.

When interpreting a statute, the Court first looks at the language of the statute. *See e.g*., *Grillo*, 540 A.2d at 751; *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753 (D.C. 1983) (en banc).  Generally, "[w]hen the plain meaning of the statutory language is unambiguous, the intent of the legislature is clear, and judicial inquiry need go no further."  *District of Columbia v. Place*, 892 A.2d 1108, 1111 (D.C. 2006); *District of Columbia v. Gallagher,* 734 A.2d 1087, 1091 (D.C.1999).  When interpreting statutes, however, the Court should not "make a fetish out of plain meaning"

nor should it "make a fortress out of the dictionary." *Place*, 892 A.2d at 1111 (citing *J. Parreco & Son v. Dist. of Columbia Rental Hous. Comm'n,* 567 A.2d 43, 46 (D.C. 1989)).  "In construing a statute the primary rule is to ascertain and give effect to legislative intent and to give legislative words their natural meaning." *Banks v. United States,* 359 A.2d 8, 10 (D.C. 1976) (quoting *General Motors Acceptance Corp. v. One 1962 Chevrolet Sedan,* 191 A.2d 140, 142 (D.C. 1963)).  Furthermore, "[t]he literal words of a statute. . . are not the sole index to legislative intent, but rather, are to be read in the light of the statute taken as a whole. . . ." *District of Columbia v. Bender,* 906 A.2d 277, 281-82 (D.C. 2006).

In this case, the statute at issue states that "[l]iability for compensation shall not apply where injury to the employee was occasioned solely by his intoxication or by his willful intention to injure or kill himself or another."  D.C. Code § 32-1503(d). Wackenhut argues that "solely" applies both to the clause referring to intoxication and to the clause referring to willful intention to injure or kill oneself.  Wackenhut Reply at 2-3. The plaintiff contends, however, that if "solely" were meant to apply to both clauses the legislature would have made this clear and the statute would read: "occasioned <u>solely</u> by his intoxication or <u>solely</u> by his willful intention to injure himself or another."  Pl.'s Sur-reply at 2.  The legislature could also have made this intent clear by making the statute read "occasioned <u>solely</u> <u>either</u> by his intoxication <u>or</u> by his willful intention to injure himself or another."  The statute takes neither of these forms, however.  Consequently, the Court finds that the plain reading of this part of the statute slightly favors the plaintiff's position.  Even so, a plain reading of this statutory text alone ultimately cannot clarify whether "solely" modifies both clauses.

When viewed in the context of other current provisions of the DCWCA, however, it is clear that "solely" only modifies the clause involving intoxication.   In another section in the same chapter of the D.C. Code as § 32-1503(d), the DCWCA enumerates certain presumptions regarding claims for workers' compensation as follows:

> In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of evidence to the contrary:
>
> [. . .]
>
> (3) That the injury was not occasioned solely by the intoxication of the injured employee.
>
> (4) That the injury was not occasioned by the willful intention of the injured employee to injure or  kill himself or another.

D.C. Code § 32-1521.

These provisions of D.C. Code § 32-1521 clearly parallel the language of  D.C. Code § 32-1503(d), but in this formulation, the "willful intention . . .to kill himself" clause and the "intoxication" clause appear in separate subsections, and the modifier "solely" appears only in connection with the "intoxication" clause.  Since different provisions of the same statute are construed harmoniously, the fact that "solely" only modifies the "intoxication" clause in this section of the DCWCA strongly indicates that "solely," as used in D.C. Code § 32-1503(d), also only applies to the "intoxication" clause.  *See Motion Picture Ass'n of Am., Inc. v. FCC,* 309 F.3d 796, 801 (D.C. Cir. 2002) (citing *Erlenbaugh v. United States,* 409 U.S. 239, 244 (1972) (acknowledging "the principle that individual sections of a single statute should be construed together.")).[5]

---

[5] In her briefing, the plaintiff argues that the legislative history of D.C. Code § 32-1503(d) also supports her position.  *See* Pl.'s Sur-reply at 2-3.  Specifically, the plaintiff notes, correctly, that the DCWCA was modeled after the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. 901 *et seq*. *See also Grillo*, 540 A. 2d at 749 n.15. The plaintiff then notes that one section of the LHWCA, 33 U.S.C. § 920, which addresses the presumption of compensation coverage, separates the clauses for

*But see Dir., Office of Workers' Comp. Programs, U. S. Dept. of Labor v. Cooper Associates, Inc.*, 607 F.2d 1385, 1391, n.4 (D.C. Cir. 1979) (quoting 33 U.S.C. § 903(b) (1977) as "No compensation shall be payable if the injury was occasioned solely by the . . . willful intention of the employee to injure or kill himself . . . .") (alteration in original) (referring to the predecessor statute to the DCWCA).

Since "solely" does not apply to both clauses of § 32-1503(d), the Court finds that there is not a substantial question as to whether the injury falls under the DCWCA. The statute is clear that "[l]iability for compensation shall not apply where injury to the employee was occasioned . . . by his willful intention to injure or kill himself or another." Thus, the Court has jurisdiction over the plaintiff's claims arising out of Mr. Bailey's suicide.

### 2.     The Plaintiff Fails to State a Claim Against Defendant Wackenhut.

Neither party disputes that the cause of death in this case is suicide. By relying on D.C. Code §32-1503(d) to escape workers' compensation coverage, the plaintiff has effectively admitted that the suicide was a willful and intentional act. The plaintiff's claim is that Defendant Wackenhut's negligence was a substantial factor in Mr. Bailey's death. Compl. ¶ 40. Unfortunately for the plaintiff, however, D.C. law does not permit recovery under these circumstances.

---

"willful intention to kill oneself and for intoxication," with "solely" only modifying the "intoxication" clause. The plaintiff is correct, but 33 U.S.C. § 920 appears to correspond to D.C. Code § 32-1521, which is discussed above and which also separates the two clauses, rather than to D.C. Code § 32-1503(d). By contrast, 33 U.S.C. § 903 is the section of the LHWCA that appears to correspond to D.C. Code § 32-1503(d). That section of the LHWCA is substantially similar to the section of the DCWCA at issue here and reads: "No compensation shall be payable if the injury was occasioned solely by the intoxication of the employee or by the willful intention of the employee to injure or kill himself or another." 33 U.S.C. § 903. Thus, the sections of the LHWCA cited by the plaintiff do not provide any further guidance to the Court beyond the guidance provided by the structure and text of the DCWCA itself.

The general rule in the District of Columbia is that a plaintiff may not recover damages in negligence from the suicide of another. *District of Columbia v. Peters*, 527 A.2d 1269, 1275-76 (D.C. 1987). "[S]uicide generally is considered to be a deliberate, intentional, and intervening act which precludes a finding that a given defendant is, in fact, responsible for the decedent's death." *Washington Metro. Area Transit Auth. v. Johnson*, 726 A.2d 172, 181-82 (D.C. 1999) (quoting *Peters*, 527 A.2d at 1275; *see also Johnson v. Wal-Mart Stores, Inc.*, 587 F. Supp. 2d 1027 (C.D. Ill. 2008) ("[S]uicide is an intervening and independent cause of death which breaks the chain of causation and precludes its liability in this case.") (internal citations omitted)).

The two recognized exceptions to this general rule that suicide bars a negligence claim do not apply here. First, there is an exception where:

> The actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity… makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason.

*Peters*, 527 A.2d at 1275-76 (citing Restatement (Second) of Torts § 455 (1977)). Here, however, the plaintiff does not contend that Wackenhut caused Mr. Bailey's mental illness in any way, or that negligence by Wackenhut resulted in delirium, insanity, or other mental conditions that precluded Mr. Bailey from making an intentional choice to commit suicide. In short, this exception does not apply.

Second, there is another exception where the defendant has a special relationship involving treatment or custodial control over the deceased that imposes a duty to take reasonable steps to prevent a reasonably foreseeable suicide. Thus, for example, "an institution, such as a psychiatric hospital, [may have] a duty of custodial care [to the

suicide victim." *Johnson*, 726 A.2d at 177-78 n.8 (citing *McLaughlin v. Sullivan*, 461 A.2d 123, 125 (N.H. 1983)).  In such cases, plaintiffs may establish negligence claims on behalf of the suicide victim.  *See Clark v. District of Columbia*, 708 A.2d 632 (D.C. 1997) (considering whether a plaintiff established a violation of a custodial standard of care in a case involving the suicide of a minor in a juvenile receiving home); *Phillips v. District of Columbia*, 714 A.2d 768 (D.C. 1998) (evaluating plaintiff's evidence establishing standard of care for negligence claim involving suicide of inmate at D.C. jail); *Powers-Bunce v. District of Columbia*, 479 F. Supp. 2d 146, 163 (D.D.C. 2007) (recognizing negligence claim arising out of suicide of prisoner in police custody); *see also McLaughlin*, 461 A.2d at 125-26 (discussing custodial duties of care to prevent suicide).  No such custodial duty is relevant in this case.

Rather, the Complaint alleges that Defendant Wackenhut was negligent when it (1) failed to take reasonable action in response to Mr. Bailey's Background Screening Report; (2) improperly and illegally allowed Mr. Bailey to possess a firearm; and (3) improperly and (3) illegally allowed him to retain the firearm for over a month.[6]   Compl. ¶ 40 (a), (b), (c).  Certainly the allegations in this case raise serious questions about the diligence and care with which Wackenhut performs background checks on the employees to whom it provides firearms.  Nevertheless, even assuming, *arguendo*, that the plaintiff's allegations are true, the defendant would still not be liable because Mr. Bailey's suicide

---

[6] The plaintiff claims that the Defendant Wackenhut violated provisions of 18 U.S.C. § 922(g) when it issued Mr. Bailey a firearm.  Compl. ¶¶ 33,40(a).  The Complaint cites §922(g), which forbids fugitives and persons committed to mental hospitals from receiving firearms. However, §922(g) restricts the actions of fugitives and mentally ill persons, not the actions of those who distribute firearms.  Section 922(d) of the same statute pertains to persons who "sell or otherwise dispose of any firearm," but the plaintiff has not addressed whether this section might apply to Wackenhut's conduct in this case. In any event, the question is academic because the plaintiff cannot recover damages in negligence for Mr. Bailey's suicide.  Courts in other jurisdictions that have faced suicide cases involving negligence claims premised on a violation of 18 U.S.C. § 922 and similar statutes have generally rejected the claims.  *See Johnson v. Wal-Mart Stores, Inc.*, 588 F.3d 439,433 (7th Cir. 2009) (citing cases).

was an intervening act that precludes liability under D.C. law and that is the law that this Court is bound to apply.

Accordingly, Defendant Wackenhut's motion to dismiss is granted.

### 3.      The Plaintiff Has Failed To State A Claim Against Defendants Otsuka America and Bristol-Myers.

The Complaint alleges that Otsuka America and Bristol-Myers ("the pharmaceutical defendants") are "strictly liable" to the plaintiff under Restatement (Second) of Torts § 402(A), which concerns liability for defective products.  Compl. ¶ 43. The pharmaceutical defendants have moved for judgment on the pleadings, arguing that the plaintiff has failed to plead sufficient facts to state a plausible products liability claim. The Court agrees with the pharmaceutical defendants and grants their motions.[7]

The District of Columbia has recognized a strict liability tort cause of action for defective products based on Restatement (Second) of Torts § 402(A).  *See Warner Fruehauf Trailer Co. v. Boston*, 654 A.2d 1272, 1274 (D.C. 1995).  Under this cause of action, "[a] product may be found defective for § 402A purposes if it has one of three shortcomings: (1) a manufacturing defect; (2) an absence of sufficient warnings or instructions; or (3) an unsafe design."  *Id.*  Section 402A establishes that in a products liability case strict liability will only be imposed if the product is "unreasonably dangerous."  *See East Penn Mfg. Co. v. Pineda*, 578 A.2d 1113, 1118 (D.C. 1990) ("[R]ecovery is predicated on findings that the product entered the stream of commerce with a design or manufacturing defect rendering it unreasonably dangerous.") (citing Restatement (Second) of Torts § 402A. cmt. J. (1965)); *McPherson v. Searle & Co.*, 775 F. Supp. 417, 421-22 (D.D.C. 1991).  An "unreasonably dangerous" product is one for

---

[7] Defendants Otusuka America and Bristol-Myers have filed separate motions under Rule 12(c).  Since their arguments are essentially the same, the Court addresses these motions together.

which "the risks, costs and benefits of the product in question and alternative designs, and that the magnitude of the danger from the product outweighed the costs of avoiding the danger." *Warner Fruehauf Trailer Co.*, 654 A.2d at 1276; *see also Webster v. Pacesetter*, *Inc.*, 259 F. Supp. 2d 27, 36 (D.D.C. 2003); Restatement (Second) of Torts § 402A, cmt. i ("The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.").

In this case, the pharmaceutical defendants argue that the plaintiff has failed to state a products liability claim because the plaintiff has essentially claimed nothing more than that Mr. Bailey "took . . . Abilify and months later committed suicide." Def. Otsuka America's Mem. in Supp. Mot. to Dismiss ("Otsuka Mem."); BMS Mem. They contend that the Complaint has not explained how their product is at fault nor has it specified which type of product liability claim the plaintiff intends to pursue. As such, the pharmaceutical defendants argue that the Complaint fails to state a claim under the federal pleading standard.

The Court agrees that the facts in the Complaint are insufficient to establish a plausible manufacturing defect, design defect, or failure to warn claim against the pharmaceutical defendants. The Complaint alleges that the defendants are liable for "manufacturing and distributing Abilify within the United States, despite its known risks of increasing suicidality in certain patients." Compl. ¶43. Furthermore, the plaintiff contends that the defendants sold the "product in a defective condition [that is] unreasonably dangerous to users and consumers. . . based on [Mr. Bailey's] use of [the] product and. . .the reasonably foreseeable consequences of fluctuations or cessations of

usage that can be expected to occur after initial utilization of this product by person with mental health issues, particularly at high dosage levels." *Id.* These allegations are vague and conclusory, and do not suffice to state a claim for relief.

In the plaintiff's opposition to the motions to dismiss, the plaintiff appears to argue that she intended to allege all three categories of products liability claims – design defect, manufacturing defect, and failure to warn. *See* Pl.'s Opp'n to Pharmaceutical Defs.' Mot. to Dismiss at 15 ("[T]he pharmaceutical Defendants do not appear to allege that Plaintiff's strict liability claim under Restatement (Second) of Torts § 402A fails to encompass all three of its specified subcategories of manufacturing defect, design defect, and failure to warn. . . . permitting an amendment so that these subcategories can be spelled out more specifically in an amended Complaint is surely well within this Court's discretion."). The Complaint, however, does not appear to contain any factual allegations to suggest that the plaintiff is asserting a manufacturing defect or failure to warn claim. There are no facts alleged that would appear to relate to manufacturing defects in the Abilify doses taken by Mr. Bailey, and, regarding the failure to warn claim, the Complaint's allegations state only that Abilify *did* carry an FDA-mandated "black box warning" regarding suicide risk. *See* Compl. ¶ 23 ("ABILIFY's prescribing information contains a black-box warning that 'Children, adolescents, and young adults taking antidepressants for major depressive disorder (MDD) and other psychiatric disorders are at increased risk of suicidal thinking and behavior.'"); *see also* BMS Mem. at 3 ("[The] Complaint alleges that [Mr. Bailey] was first prescribed Abilify in mid-May 2008. In May 2007, the. . . [FDA] required that all antidepressants include a black box warning about the risk of suicidality in young adults ages 18 to 24. Thus, at the time [Mr. Bailey]

received his prescription, the Abilify product labeling contained a black box warning
unambiguously stating that '[c]hildren, adolescents, and young adults taking
antidepressants for major depressive disorder (MDD) and other psychiatric disorders are
at increased risk of suicidal thinking and behavior.'").[8]

     The Complaint also fails to plead sufficient, non-conclusory allegations to
establish a design defect claim.  To prevail on a design defect claim, the plaintiff would
have to show "the risks, costs and benefits of the product in question and alternative
designs, and that the magnitude of the danger from the product outweighed the costs of
avoiding the danger." *Warner Freuhauf Trailer Co.*, 654 A.2d at 1276; *Webster*, 259 F.
Supp. 2d at 36.  With respect to pharmaceutical drugs in particular, there is a well-
established gloss on the Restatement (Second) of Torts §402A, known as "Comment k,"
that typically modifies the standard for products liability into an analysis more similar to
ordinary negligence than to strict liability.  *See Dyson v. Winfield*, 113 F. Supp. 2d 35, 39
(D.D.C. 2000), aff'd sub nom. *Dyson v. Pharmacia & Upjohn Co., Inc*., 21 Fed. App'x 2
(D.C. Cir. 2001).   Comment k states in relevant part that:

> There are some products which, in the present state of human knowledge, are
> quite incapable of being made safe for their intended and ordinary use and that
> these products are especially common in the field of drugs. . .Such a product,
> properly prepared, and accompanied by proper directions and warning, is not
> defective, nor is it unreasonably dangerous.

Restatement (Second) of Torts § 402A, cmt. k. (1965); *see also Dyson*, 113 F. Supp. 2d at
40.  Under Comment k, a "drug manufacturer's duty . . . is to properly prepare[ ]" the

---

[8] In connection with its discussion of the black box warning, the Complaint also alleges generally that the
pharmaceutical defendants may have promoted "off label uses" of Abilify, but the Complaint contains no
facts or allegations to indicate what these off-label uses were and the Complaint does not suggest that Mr.
Bailey's prescription was an "off-label" use.  *See* Compl. ¶¶ 22-23.

drug and include "proper directions and warning[s]" with it.  *Dyson*, 113 F. Supp. 2d at 40.

The Complaint here does not allege that the pharmaceutical defendants failed to properly prepare Abilify or failed to include proper directions and warnings.  Even if the plaintiff were to argue that Comment k is inapplicable here, the Complaint does not contain any specific allegations to suggest that "the risks, costs and benefits of the product in question and alternative designs, and that the magnitude of the danger from the product outweighed the costs of avoiding the danger."  *Warner Freuhauf Trailer Co.*, 654 A.2d at 1276 (internal quotations and citations omitted).  The Complaint does not allege that the risks of Abilify outweigh its benefits or that there was any equally effective alternative design or manner of increasing the safety of the product.  Indeed, the Complaint does not attempt to identify what about Abilify made it "defective," other than its "known risks of increasing suicidality in certain patients" – a danger that the plaintiff admits was specifically described in the drug's FDA-mandated warning materials. Compl. ¶¶ 23, 43.  Thus, the plaintiff has not met her burden to allege facts showing that Abilify is defective or is not a reasonably safe product.  Without further factual allegations about the supposedly defective nature of Abilify, the allegation that the drug is "unreasonably dangerous" and hence defective is merely a legal conclusion.[9]  *See*

---

[9] The Complaint contains several allegations about Abilify that are irrelevant to the plaintiff's claim.  For example, as noted above, the plaintiff alleges that the defendants promoted off-label uses of Abilify, but does not allege that Mr. Bailey engaged in an off-label use.  Similarly, the plaintiff claims that "the safety of doses of Abilify oral or Abilify Injection above 30 mg / day has not been evaluated in clinical trials." Pl.'s Opp'n to Pharmaceutical Defs.' Mot. to Dismiss at 9 (quoting Compl. ¶ 25).  Yet, the plaintiff makes no allegation nor pleads any facts to suggest that Mr. Bailey took more than 30 mg of Abilify per day. Finally, the plaintiff emphasizes that her allegation about the "maximum dosage was also pleaded in the context of these Defendants' 'promotional efforts directed at prescribers,' Complaint ¶ 23, including 'paid remuneration in the form of consulting arrangement fees to physicians to induce them to prescribe ABILIFY.'"  Pl.'s Opp'n to Pharmaceutical Defs.' Mot. to Dismiss at 9-10. The plaintiff, however, does not

*Lewis v. Abbott Laboratories*, No. 08 Civ. 7480, 2009 WL 2231701, at *4 (S.D.N.Y. July 24, 2009); *Lewis v. White*, No. 08 Civ. 7480, 2010 WL 6465230, at *4 (S.D.N.Y. July 1, 2010) ("[P]laintiff's allegations are conclusory. Further, plaintiff has not alleged that it was feasible for [pharmaceutical company defendants] to design [the drug] in a safer manner. Thus, plaintiff has not met her burden to allege evidence that [the drug] is not reasonably safe."); *Bodley v. Foster Wheeler Energy Corp.*, No. 10-CV-51, 2011 WL 1576673, at *3 (D.V.I. Apr. 26, 2011) ("[T]here is consensus that when the plaintiff alleges that a product is defective in design, he or she has asserted a legal conclusion. . . . a 'plaintiff's bald assertion' that a device is defective is insufficient to state a claim of products liability."); *Frey v. Novartis Pharmaceuticals Corp.*, 642 F. Supp. 2d 787, 795 (S.D. Ohio 2009) ("Plaintiffs' design defect claim must . . . be dismissed because plaintiffs have once again simply provided a formulaic recitation of the elements of a claim under the [relevant state products liability] statute."); *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-51 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . . It is the conclusory nature of respondent's allegations . . . that disentitles them to the presumption of truth.").

The plaintiff contends that absent "discovery, a public admission, or a spy, . . . many plaintiffs will have no way to prove their case," if the Court applies an overly burdensome pleading standard for defective product claims.  Pl.'s Opp'n to Pharmaceutical Defs.' Mot. to Dismiss at 8.  While the Court is sensitive to this concern, in this case, the plaintiff has not alleged sufficient facts establishing any plausible claim that Mr. Bailey's suicide resulted from the defective nature of Abilify.

---

explain how any alleged consultation fees paid to prescribers of Abilify are relevant to her claim that the drug was defective.

Where the plaintiff has failed to support conclusory allegations of a defective product with specific facts that "nudge[ ] [his or her] claims across the line from conceivable to plausible," the Court must dismiss the claim.  *Twombly,* 550 U.S. at 570; s*ee also Lewis*, 2009 WL 2231701, at *4 (dismissing plaintiff's claims as conclusory where the Complaint simply alleged that a drug was both inherently dangerous and that the side effects outweighed the benefits because it caused pancreas, liver, and kidney disease; blood disorders; hair loss; skin conditions; and brain damage.); *Bodley*, 2011 WL 1576673, at *4 (dismissing defective medical device claim).  Therefore, the plaintiff's product defect claim against the pharmaceutical defendants must be dismissed.  The motions for judgment on the pleadings of Defendants Otsuka America and Bristol-Myers are therefore granted.[10]

### III. CONCLUSION

For the reasons explained above, Defendant Wackenhut's motion to dismiss and the pharmaceutical defendants' motions for judgment on the pleadings are GRANTED. An Order consistent with this Memorandum Opinion will be entered.

DATED: August 10, 2011                    /s/ *Beryl A. Howell*

                                          BERYL A. HOWELL
                                          United States District Judge

---

[10] In her opposition memorandum, filed in February 2010, the plaintiff indicated that she intended to seek leave of the Court to amend the Complaint, but no motion for leave to amend has been filed.  To the extent that the plaintiff has requested leave to amend the Complaint in her opposition memorandum itself, that request is denied because the plaintiff has not indicated that she will be able to plead sufficient facts to state a claim for relief.  Accordingly, amendment would be futile.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962).  In addition, the pharmaceutical defendants' request for an oral hearing on their motions under Local Rule 7(f) is denied.